## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AARON PATTERSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No.    03 C 4433 |
| **vs.** | ) | |
| | ) | **Judge Gottschall** |
| Former Chicago Police Lt. JON BURGE, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM IN SUPPORT OF THE MOTION OF PEOPLE'S LAW OFFICE AND STAN WILLIS FOR AN AWARD OF ATTORNEYS' FEES AND COSTS PURSUANT TO QUANTUM MERUIT

Now come the undersigned attorneys from the People's Law Office, together with attorney Standish Willis, and in support of their motion to adjudicate their entitlement to attorneys' fees and costs pursuant to *quantum meruit*, and to set a reasonable attorneys' fee to be paid by Plaintiff Aaron Patterson to all of his attorneys, state as follows.

### I.       Introduction

Counsel from the People's Law Office (PLO), who represented Plaintiff Aaron Patterson in his criminal and civil cases for a total of twelve years, together with their co-counsel, attorney Standish Willis, seek adjudication, pursuant to principles of *quantum meruit*, of their entitlement to attorneys' fees from the settlement with the City of Chicago entered into by Plaintiff Aaron Patterson.  *See Kannewurf v. Johns*, 260 Ill. App. 3d 66 (5th Dist 1994). The hours expended by petitioning counsel in Plaintiff's civil case, their obtaining of his exoneration on the basis of torture and innocence in his criminal case, which was a legally required pre-requisite to filing and maintaining his 42 U.S.C. § 1983 civil suit, (*see Heck v. Humphrey*, 512 U.S. 477 (1994)), the post withdrawal time expended by petitioning counsel which further substantially aided the Plaintiff in both trial preparation and settlement, and the substantial contingent risk assumed by counsel when they undertook litigating Plaintiff's civil case, all powerfully support the setting of the *quantum meruit* award to PLO and Stan Willis at either Plaintiff's original 33.3 % retainer of the amount being offered in settlement while counsel was representing Plaintiff; alternatively at

1

33.3% of the amount at which Patterson eventually settled; or alternatively at the amount computed based on the number of hours expended by counsel on Plaintiff's civil case, at their customary current hourly rates. *See Wegner v. Arnold*, 305 Ill. App. 3d 689, 696 (2nd Dist. 1999). Additionally, counsel further moves that this Court set a reasonable total fee that Plaintiff will have to pay all counsel, and to weigh the comparative contributions and risks of former and present counsel, in apportioning the fee according to *quantum meruit*. *Id*.

## II. History of People's Law Office's Involvement in the Police Torture Cases

PLO lawyers G. Flint Taylor, John Stainthorp and Jeffrey Haas first became involved in the police torture cases in 1986 when they undertook the representation of torture victim Andrew Wilson in his *pro se* civil rights lawsuit against Area 2 police commander Jon Burge and the City of Chicago. During the 11 years that the PLO represented Wilson, many legal, factual and evidentiary accomplishments were obtained that impacted both directly and indirectly on Plaintiff Patterson's criminal and civil cases. During that litigation, with the assistance of anonymous letters from an Area 2 source, PLO lawyers, through years of investigation and research, were able to develop the factual predicate which established that there was a pattern and practice of police torture and abuse at Area 2 under Burge's command. The *Wilson* litigation and the evidence of a pattern of police torture in turn led to a Chicago Police Department (CPD) Office of Professional Standards (OPS) investigation, OPS findings of "systematic" torture at Area 2, and the firing of Burge for the torture of Andrew Wilson. In the *Wilson* litigation itself, PLO lawyers obtained a jury verdict that the CPD had a policy and practice of abusing suspects in police shooting cases; a Seventh Circuit decision which established that other similar cases of police torture could be introduced against Burge and his men under Fed. R. Evid. 404(b), (*Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993)); summary judgment against Burge for torturing Wilson, (*Wilson v. City of Chicago*, 900 F. Supp. 1015 (N.D. Ill. 1995)); and, most significantly, a subsequent Court of Appeals decision which required the City to pay any and all judgments and attorneys' fees obtained against Burge for his torture of Wilson because torture of suspects was within the scope of Burge's employment as a CPD officer. *Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997).

## III. Representation of Plaintiff Patterson in His Criminal Case

Attorneys Flint Taylor and Jan Susler of the PLO undertook the criminal representation of Aaron Patterson in January of 1994. At this time, Plaintiff's criminal case was at its absolute

nadir, as the Illinois Supreme Court had affirmed his conviction and death sentence while rejecting his argument that his confession had been tortured from him.[1] *People v. Patterson*, 154 Ill. 2d 414 (1992). Using the systemic torture evidence developed in the *Wilson* case, as well as newly discovered evidence that Burge himself was involved in Plaintiff's torture, PLO counsel filed a post conviction petition, later amended, that argued that this evidence required that Plaintiff be afforded a new suppression hearing and trial. Additionally, counsel also developed evidence that Plaintiff was actually innocent, obtaining recantations from a key witness against Plaintiff and affidavits that implicated another individual, Willie Washington, as the actual perpetrator of the crime. Additionally, counsel had Plaintiff examined by a psychologist experienced in evaluating victims of torture, who found that Plaintiff was suffering from post traumatic stress disorder as a result of his torture. These petitions had many hundreds of pages of evidentiary support, and were the first to comprehensively raise the systemic Area 2 torture issue in Illinois post conviction proceedings.

The trial judge denied the petition, and PLO attorneys represented Patterson in his appeal to the Illinois Supreme Court. At the same time, PLO attorneys made an unsuccessful attempt to convince State's Attorney Richard Devine to voluntarily agree to a new hearing and trial for Plaintiff.[2] No prior post-conviction torture victim had successfully obtained relief from the Illinois Supreme Court on the basis that his confession had been tortured from him, and the Court's standard under *People v. Wilson*, 116 Ill. 2d 29 (1987) - - - that there had to be physical evidence of abuse - - - seemed virtually insurmountable in Plaintiff's case. Emphasizing that torture, under standards of international law, by design did not leave evidence of physical injury, PLO counsel obtained, in September of 2000, a landmark victory for Plaintiff when the Illinois Supreme Court held that he was entitled to a hearing on his claims that his confession was tortured from him and that his trial counsel was ineffective. *People v. Patterson*, 192 Ill. 2d 93 (2000). As significantly, the Court recognized the evidentiary significance of the evidence of systemic torture at Area 2 as well as the evidence which suggested Plaintiff's innocence.

On remand to Cook County Circuit Court Judge Michael Toomin, PLO lawyers prepared to proceed with an extensive evidentiary hearing on the torture question, patterning it after a

---

[1] The representation was by contract with the Capital Litigation Division of the Illinois Appellate Defender's Office, which paid counsel a small fraction of the fees earned, since both the hourly rates and the total amount compensated were capped.
[2] Instead Devine unsuccessfully moved the Supreme Court to indefinitely stay Plaintiff's appeal.

similar hearing that they had conducted in *People v. Cannon*, No. 83-11830 (Circuit Court of Cook County). This preparation included filing an extensive motion for summary judgment on the systemic torture issue, in which counsel marshaled and updated the supporting evidence, including the testimony of thirty five additional torture victims which they had recently discovered. In 2002, they also took a leading role in drafting and presenting a motion to the Chief Judge of the Cook County Criminal Court on behalf of the Plaintiff and other death row torture victims, seeking the disqualification of State's Attorney Devine and the Cook County State's Attorney's Office from further participation in their cases.[3]

Contemporaneously, the anti-death penalty movement was gathering momentum in its campaign to convince Governor George Ryan to grant clemency to all of the men and women on death row. In late 2002, after PLO lawyers took an active role in presenting torture evidence at the Governor's clemency hearings, and speaking publicly on behalf of mass clemency, the Governor's office indicated that he was considering innocence pardons to several death row torture victims, including Plaintiff. In response to specific inquiries, PLO counsel sent the Governor detailed letters setting forth the case for Plaintiff's innocence pardon on the basis of his torture, and vouching for his post release behavior. On January 10, 2003, the Governor, relying on the torture and innocence evidence developed by PLO lawyers and their investigators, granted Plaintiff his innocence pardon, and he was released that day.

### IV. The Civil Case
### A.    People's Law Office's Pre-Withdrawal Involvement

In June of 2003, PLO lawyers entered into a retainer agreement with Plaintiff Patterson which provided that the Plaintiff pay a contingent fee of 33.3% of any settlement or judgment, plus costs, and further that: "in the event the client obtains other lawyers to represent him in this matter prior to final resolution, the replaced attorney or attorneys shall be entitled to a fee of the reasonable value of services provided based on the number of hours spent by such attorney or attorneys multiplied by the hourly rate of such attorney or attorneys."[4] They then filed a 30 page

---

[3] This motion was granted in 2003, after Plaintiff had been pardoned. *In Re Appointment of A Special Prosecutor, In the Matters of Aaron Patterson et. al.,* No. 2001 Misc 4, (Memorandum Op. and Order of April 9, 2003, Biebel, J.)
[4] The attorneys agreed to split their share as follows: 70% to People's Law Office, 20% to Standish Willis and 10% to Demitrus Evans. Mr. Willis, a prominent African-American attorney and former PLO partner, was added to the civil litigation team because of his prior involvement in the public relations and community education aspects of Plaintiff's criminal case, and his long-standing community work on the issues of police torture and abuse. Ms. Evans, who had also worked on Plaintiff's criminal case while interning at Mr. Willis' office, was added at Plaintiff's request. The retainer is attached as Exhibit A.

4

twelve count complaint under 42 U.S.C. § 1983 and state law alleging, *inter alia*, that Plaintiff was tortured by Burge and his men, in conspiracy and pursuant to a City practice and custom, into giving a false confession which led to his wrongful conviction and imprisonment. (*Patterson v. Burge*, 03-C-4433, Dkt. 1) In light of Seventh Circuit law, the torture claim itself was limited to a Fifth Amendment coercive interrogation claim. The factual predicates for the claims of innocence and systemic torture were based on the evidence developed by PLO lawyers in the *Wilson* and *Patterson* criminal cases. In December of 2003, the complaint was amended, pursuant to the Seventh Circuit's intervening decision in *Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003), to add a Fourth Amendment excessive force torture claim. (*Patterson* Dkt. 43)

In the Fall of 2003, the City moved to "structure" and to bifurcate discovery so that Plaintiff would be precluded from seeking discovery on his systemic pattern and practice claims until after discovery against the individual defendants was concluded. (*Patterson* Dkt. 31) PLO lawyers opposed this motion, and it was denied. (*Patterson* Transcript of Oct. 31, 2003) Subsequently, all discovery that pertained to the City was consolidated in the four pending torture and pardon cases.[5] (*Patterson* Dkt. 163)

PLO counsel then proceeded, together with Plaintiff's counsel in the other three torture cases, to seek and obtain document discovery. After reviewing over sixty boxes of City documents and litigating several motions to compel, counsel culled a body of documents that had relevance to their claims against the City and the individual Defendants. PLO counsel also produced more than 20 boxes of files for the Defendants' inspection and copying, and answered extensive interrogatories and document demands tendered by the various Defendants. PLO counsel then sought answers to interrogatories and depositions of the Area 2 Defendants and numerous other relevant Area 2 witnesses. The Area 2 Defendants sought to stay the depositions and interrogatory answers while the Special Prosecutors' investigation of Area 2 torture was pending, but, after extensive litigation in both state and Federal Court, the stay was denied in June of 2004, and discovery against these Defendants and witnesses was ordered to proceed. (*Patterson* Dkt. 104)[6]

The Defendants had also filed multiple lengthy motions to dismiss the complaint, which

---

[5] *Patterson v. Burge; Hobley v. Burge,* 03-C-3678; *Orange v. Burge*, 04-C-0168; *Howard v. Chicago*, 03-C-8481.
[6] PLO lawyers worked with other lawyers and community organizations to obtain the 2002 appointment of the Special Prosecutors and subsequently supplied them with a wealth of evidence developed in the civil cases.

required extensive responses. On August 5, 2004, this Court denied these motions to dismiss as to the vast majority of Plaintiff's claims. *Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004). Significantly, the Court upheld, *inter alia*, Plaintiff's Fourth and Fifth Amendment torture claims, his Fourteenth Amendment wrongful conviction claim, his claims against the command and supervisory police and prosecutor Defendants, and his systemic torture claims against the City. At the heart of the Court's decision was the determination that all of Plaintiff's claims were both actionable and timely because of the January 2003 innocence pardon that counsel had obtained through nine years of work on Plaintiff's criminal case.

In the summer of 2004, the Defendants, pursuant to the June 2004 Court order obtained by PLO counsel, tendered answers to the propounded interrogatories, in which they uniformly asserted the Fifth Amendment in response to all questions. In the fall of 2004, PLO lawyers began an intensive campaign to take the consolidated depositions of Burge, other Area 2 Defendants, other Defendants and witnesses. In the next year, PLO counsel took more than 30 of these depositions, with the Defendants and other Area 2 Defendants again uniformly taking the Fifth Amendment. This campaign was extremely beneficial to Plaintiff's litigation and settlement position because these assertions of the Fifth Amendment would, under *Baxter v. Palmigiano*, 425 U.S. 308 (1976), be admissible at trial, and a negative inference could be drawn against the asserting Defendants by the jury from their invocation of the Fifth Amendment.

During 2004 and 2005, PLO lawyers also took a number of additional depositions of defendants and witnesses who did not assert the Fifth Amendment, and defended several depositions taken by the Defendants, most notably, the depositions of the Plaintiff, his criminal co-defendant, and two witnesses on his claim of innocence. Through the efforts of counsel before this Court, Plaintiff's deposition was stayed until after his Federal criminal trial was concluded, and his conduct at that trial (*see U.S. v. Mannie*, ___ F. 3d ___, 2007 U.S. App. LEXIS 28683 at *5-10 (7th Cir. 2007)) required significant additional work in order to set up several sessions of the videotaped deposition amid heightened security concerns, and to prepare him for his deposition after he had refused to subject himself to cross examination as a defense witness in his federal criminal case. In total, PLO lawyers took and defended approximately forty depositions during this eighteen month period. The City again sought to bifurcate discovery and trial of the pattern and practice claims against it, and, after extensive briefing, the Court again denied the City's attempt to remove itself from the fray. (*Patterson*, Dkt. 297)

Additionally, PLO counsel built the record and, with their consolidated co-Plaintiffs, pursued the deposition of Mayor Daley, who was a major actor in the events that underlay Plaintiff's claims against other command level police and prosecutor Defendants. (Dkt. 131, 195)

Additionally, in 2004 and 2005, PLO counsel and their investigator continued to develop the powerful record of systemic torture for use as 404(b) and pattern and practice evidence. They did so by traveling across the state and the country, from Florida to Arizona, taking sworn statements from numerous Burge torture victims. Even more significantly, they located several retired African American detectives who had worked at Area 2 under Defendants Burge and Byrne, and for the first time, obtained sworn, court reported statements in which they set forth powerful corroborative evidence of systemic torture at Area 2.

While discovery proceeded, settlement discussions with the City, first on behalf of Plaintiff Patterson alone, then later, jointly on behalf of all four torture/pardon Plaintiffs, were also proceeding. After a tentative agreement to jointly settle was reached in late 2005, Plaintiff refused to settle for any amount of money and refused to otherwise cooperate with People's Law Office counsel, and on January 23, 2006, PLO and their co-counsel, Standish Willis and Demitrus Evans, successfully moved to withdraw due to "irreconcilable differences." (Dkt 393, 397) (See Section C, below.) Prior to withdrawing, counsel served, on January 19, 2006, an attorneys' lien. (Attached as Exhibit B)

**B.      PLO's Post Withdrawal Involvement**

In February of 2006, PLO counsel tendered Plaintiff his voluminous file on several computer compact discs. After proceeding *pro se* until June of 2006, Plaintiff Patterson retained attorney Frank Avila to represent him. Wallace "Gator" Bradley, a non-lawyer who describes himself as an "urban translator," has recently testified that he brought Plaintiff's case to Mr. Avila.[7] Mr. Avila and Plaintiff negotiated a retainer which provided that Avila and lawyers obtained by him would share 33.3 % of any recovery, regardless of what additional fees would be due PLO and their co-counsel. As one of his first acts after entering his appearance, Mr. Avila moved to adopt all prior pleadings filed by the PLO and their co-counsel. (Dkt. 462) When the Defendants moved to reconsider the Court's prior denial of their motion to dismiss Plaintiff's

---

[7]On December 10, 2007, Mr. Bradley testified before the Chicago City Council Finance Committee that "Avila and the Texas lawyers took the case after I presented the case to Frank Avila and I did that as an 'urban translator.'" (PLO has a video of this testimony and has ordered the transcript.)

Fourth Amendment torture claim in light of the Seventh Circuit's intervening decision in *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006), Mr. Avila and his co-counsel re-filed, almost word for word, without attribution, the response that PLO counsel had filed on behalf of their client, Leroy Orange, in his consolidated torture/pardon case. (Compare *Patterson* Dkt. 484 with *Orange* Dkt. 208)[8]  In October of 2006, when Magistrate Judge Brown ordered that counsel in all of the consolidated cases meet in her jury room to establish a consolidated deposition schedule, neither Mr. Avila nor any of his co-counsel appeared, and the schedule was adopted in their absence. (Dkt. 324)

Despite no longer representing him, PLO counsel, by dint of the prior discovery consolidation order, continued to conduct the lion's share of Mr. Patterson's discovery, almost always without any of Mr. Patterson's present counsel in attendance or participating.  This included the consolidated re-depositions of Area 2 Defendants Byrne, McWeeny, and Madigan,[9] the depositions of command Defendants Leroy Martin, Gayle Shines, Thomas Needham, and Richard Devine,[10] and the depositions of witnesses Lawrence Hyman, William Kunkle, and Peter Dignan.  Additionally, PLO counsel, again without participation from Mr. Avila and his co-counsel, defended the consolidated depositions of a number of additional torture victims whom Plaintiff Patterson had listed as 404(b) witnesses in his case, as well as an African American detective who had testified that he saw Burge's electric-shock box. In contrast, Patterson's present counsel noticed several depositions, but none proceeded, and they defended only a handful taken by the Defendants.[11]   Discovery in the *Patterson* case was about to close when settlement in his case was placed on the record by Mr. Avila on November 9, 2007.

C.    **Settlement**

Plaintiff Patterson initiated discussions in late 2003 with Alderman William Beavers who contacted Corporation Counsel Mara Georges who then contacted PLO lawyer Flint Taylor.  In

---

[8] The Court denied the Defendants' motion after briefing. (Dkt. 531)

[9] After the Special Prosecutor released his report without indictments in July of 2006, the Area 2 Defendants, except for Burge, came off the Fifth Amendment and gave substantive depositions.  Mr. Avila attended Madigan's deposition, and Mr. Barry attended one session of McWeeny's deposition, but neither asked any questions.

[10] Mr. Avila attended part of the second session of Defendant Devine's deposition, and questioned him primarily about his purported connection to allegedly corrupt politicians, and about a  former employee. After an associate of Mr. Avila put the video of Avila's questioning on the Internet, an infuriated Mr. Devine moved to put his entire deposition under protective order.

[11]  Mr. Avila's office defended the depositions of Joanne and Raymond Patterson and the final sessions of Plaintiff's deposition.

January of 2004, Ms. Georges offered $4,000,000 to settle Plaintiff's claim against the City and their defendants. (*Chicago Tribune*, July 30, 2005, attached as Exhibit C) At this point, Plaintiff was seeking a settlement in the range of $10,000,000 to $13,000,000, and Ms. Georges refused to further negotiate if he did not substantially lower his demand. After further discussion with Plaintiff, he permitted PLO to explore a lower number, and Mr. Taylor asked Ms. Georges in early June of 2004 whether she would offer $5-6 million. Ms. Georges said that she would consider such an offer if Plaintiff would accept that amount. Plaintiff reacted negatively to this, and, before further discussions could be pursued with Plaintiff, he was arrested in early August of 2004 and charged in a Federal conspiracy to sell guns and narcotics.

Ms. Georges then refused to further negotiate individually with Plaintiff, stating that new City counsel from Dykema, Gossett had advised her to negotiate all four of the torture/pardon cases together as a package settlement. This led to written demands from the four Plaintiffs, a formal offer from the City that reduced the offer to Plaintiff Patterson to less than $1 million, and a late 2004 meeting with Ms. Georges. In March of 2005, the four cases were sent by agreement to Magistrate Michael Mason for mediation, and there was little movement for several months until late in 2005, when Magistrate Mason informed Plaintiffs' counsel that the City was willing to offer a total of $16.5 million for the four Plaintiffs. Plaintiffs' counsel informed Magistrate Mason that they would accept the offer if Plaintiff Patterson and his lawyers could work out his portion of the settlement. This led to numerous intense discussions between Plaintiff Patterson and his lawyers, during which Plaintiff repeatedly changed his position as to whether and for what he would agree to settle. At one point during this process, Plaintiff Patterson indicated that he wanted to settle, that the total amount of $16.5 million was acceptable, but that he wanted to dictate how much each of the other Plaintiffs should receive; additionally, Plaintiff asserted that the settlement should include a provision that he meet with Mayor Daley, and that each Plaintiff contribute a portion of his settlement to a third party.

These sometimes emotional and often frustrating discussions were being held in the wake of Plaintiff's conduct at his criminal trial, (*see U.S. v. Mannie*) and his refusal, contrary to PLO counsel's advice, to answer certain questions at his deposition, jeopardizing the future of his civil case. Convinced that the settlement offer was in Plaintiff's best interest, PLO lawyers offered Plaintiff a guaranteed minimum of $2.4 million net, after fees, costs, and his loan were

repaid,[12] and, depending on what the final split was between the four Plaintiffs, the PLO would make up any difference from its fee contingency. When the lawyers brought this offer to Plaintiff on four separate occasions in January of 2006, he refused to agree, and further said that he would not settle for any amount. In light of Plaintiff's constantly shifting position on settlement, his conduct during his deposition, his failure to heed counsel's advice, his non-cooperative attitude, and his final assertion (repeated on multiple occasions) that he would not accept any amount in settlement, Plaintiff's counsel reached the reluctant conclusion that their relationship with Plaintiff had irretrievably broken down, and moved to withdraw. This Court granted that motion. (Dkt. 389)

Magistrate Mason then convinced the City to negotiate with the three remaining Plaintiffs as a group, and Ms. Georges reluctantly agreed. Magistrate Mason communicated to Plaintiffs' counsel that he thought the City would offer $13.75 million to the three remaining Plaintiffs but the number was rejected, and, in the summer of 2006, the three cases were transferred to Judge Marvin Aspen for further mediation. In the fall of 2006, the City offered $14.8 million to settle the three cases against it and its Defendants, and the Plaintiffs accepted in early November. After the City refused to finalize the deal, Judge Aspen declared negotiations at an end and asserted that the City had not bargained in good faith. (*Orange* Dkt 395, 397)

In response, PLO lawyers and their co-counsel[13] moved to enforce the agreement, and publicly revealed the $14.8 million settlement amount. (*Id.*) Directly thereafter, Magistrate Brown granted the pending motion to depose Mayor Richard Daley, which was drafted, developed, and litigated by PLO lawyers and their co-counsel in the consolidated cases, to be taken in the *Hobley* case. *See Hobley v. Burge*, 2007 U.S. Dist. LEXIS 12159 (N.D. Ill.). PLO lawyers also started a campaign with City Council for it to enforce the settlement, highlighting the fact, obtained by PLO lawyers in a series of FOIA requests, that the City was paying private counsel many millions of dollars to defend Burge and the City in the torture cases. After PLO lawyers expended many months of exhaustive work, City Council passed a resolution to hold

---

[12] Against the strong advice of the PLO lawyers that Plaintiff **not** take out a usurious loan, he nonetheless contacted a loan agency and took out such a loan, and, by early 2006, the amount due was about $300,000. Counsel was confident that they could significantly reduce the amount owed through negotiations with the lender, and so informed the Plaintiff.

[13] PLO lawyers Taylor, Mogul and Deutsch, together with Professor Sam Tenenbaum of Northwestern Law School's Blum Legal Clinic, represented Plaintiff Leroy Orange in these continuing settlement proceedings.

torture hearings, and on July 19, 2007, thirteen aldermen introduced another resolution, originally proposed by PLO lawyers and their co-counsel, to settle all of the torture cases.[14]

      The highly publicized torture hearings took place on July 26, 2007, and several PLO lawyers testified, presenting evidence that the City had spent more than $10 million to defend Burge and the City in the civil torture cases, as well as evidence concerning the $14.8 million settlement that the City refused to honor. A key piece of evidence presented was a fifteen minute video, put together and presented by PLO attorneys, in which several torture victims described their torture and Burge invoked the Fifth Amendment as to whether he tortured them. (*Chicago Sun Times*, January 9, 2008, attached as Exhibit D)[15] Many indignant Aldermen publicly condemned both the torture and the City's continuing defense of these indefensible acts, again called on the City to settle all of the torture cases, and demanded a Finance Committee hearing on defense fees and settlement.[16] In the fall of 2007, the Finance Committee hearing was scheduled, and PLO counsel, at the request of several aldermen, obtained an expert who projected minimum and maximum exposure that the City faced in defense attorneys' fees, judgments, and Plaintiffs' attorneys fees if the City continued to litigate the cases. The maximum projected amount was staggering - $195 million in fees and judgments. (*Chicago Sun Times*, September 23, 2007, attached as Exhibit E) PLO lawyers, together with six Aldermen, publicly released this report, announced that the expert would testify at the hearings, and the report led to a September 25, 2007 *Chicago Sun Times* editorial, entitled *Stop the Financial Torture, Settle Burge Lawsuits Now*, that called for settlement of all the torture cases. (Exhibit F.) The City then re-opened negotiations in the three cases, and the City Council Finance Committee hearing on defense fees and settlement, scheduled for the next day, was continued.

      During the next month, PLO lawyers and their co-counsel worked out the details of the $14.8 million settlement for the three torture cases, and the agreement was formally presented to

---

[14] Central to this campaign was the widely publicized *Report on the Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle to Fairly Investigate Police Torture in Chicago*, drafted by PLO lawyers in collaboration with Northwestern Law School and the MacArthur Justice Center and signed by 212 prominent individuals and organizations in the fields of human rights, criminal law and racial justice. This report can be found at http://www.law.northwestern.edu/macarthur/police/area2.html. This report demanded, *inter alia*, City Council and County Board Hearings, a Federal investigation, and that the City immediately desist from further funding of Burge's defense in the civil torture cases. This Report directly led to County Board and City Council hearings, and to the City Council resolution that called on the City to no longer fund Burge's defense, and to settle all of the torture cases.

[15] This video can be viewed at: http://video.google.com/videoplay?docid=-1740730225342200983.

[16] The video of this hearing can be found at http://video.google.com/videoplay?docid=166336657878016033.

11

Judge Aspen and put on the record on November 9, 2007. During this time, Plaintiff Patterson's attorneys also pursued settlement of their case, and later on November 9 informed Judge Aspen that Plaintiff would accept the City's offer of $5 million, and put their agreement on the record. Based on these oral settlement agreements, settlement papers documenting the settlements were prepared, and properly signed and executed by Madison Hobley and current PLO client Leroy Orange. In order to facilitate the settlement of Mr. Patterson's case and to protect PLO counsel's right to fees, PLO counsel and Mr. Willis executed waivers of lien premised on the contingency that Plaintiff's dismissal order include the following language:

> The Court retains jurisdiction to enforce the settlement as reflected in the Release and Settlement Agreement. Further, the Court retains jurisdiction to adjudicate the attorneys' liens of plaintiff's former and current attorneys (Avila & Tomic; Barry & Loewy; People's Law Office; Law Office of Demitrus Evans; Law Office of Standish E. Willis) and resolve all issues and disputes related thereto. The attorneys' liens shall attach to the settlement funds. In the event of a dispute regarding the above referenced attorneys' liens, the settlement proceeds (excluding the separate payment to Whitehaven described in Paragraph 4 of the Release and Settlement Agreement) are to be deposited in an interest bearing account with the Clerk of the United States District Court for the Northern District of Illinois and shall not be disbursed unless and until ordered by the Court.

The Waivers are attached as Exhibit G.

On December 7, 2007, the City informed the media of the agreement to settle in the four cases. According to one news article that followed, Wallace "Gator" Bradley "now says Patterson's attorney, Frank Avila, owes him $250,000 for his work." (*Chicago Sun Times*, December 8, 2007, attached as Exhibit H)[17] On December 10, 2007, the settlements were approved by the City Council Finance Committee, subject to Mr. Avila's presentation of a signed power of attorney from Plaintiff. That same day PLO counsel and Mr. Willis filed their Motion to Adjudicate Attorneys' Lien. (Dkt. 820) At the full City Council meeting on December 12, 2007, consideration of all four settlements was continued to January 9, 2008, because Mr. Avila was unable to produce either a power of attorney signed by Mr. Patterson authorizing the amount which he had orally agreed to accept, $5 million, or signed settlement papers.[18] (*Chicago Reader*, December 13, 2007, attached as Exhibit I). At a December 13,

---

[17]In his December 10 Finance Committee testimony, Bradley confirmed that Avila and/or Patterson had promised to pay him for his "work," in the context of his "presentation"of the case to Avila when he claimed (wrongly) that "he was the only African American who is getting anything from the Plaintiffs," and further asserted that "I'm about to be paid."

[18] There was also an issue concerning the language in the *Howard* settlement papers, but that was subsequently resolved by agreement. (*Chicago Reader*, December 13, 2007, attached as Exhibit I)

2007, appearance, this Court set a briefing schedule on the Motion to Adjudicate, and a status for January 16, 2008.  (Dkt. 826)

After a late December visit to Plaintiff in prison, Mr. Avila finally obtained the signature that he had previously represented he already had, and presented it to the City lawyers.  (*Chicago Sun Times*, January 3, 2008, attached as Exhibit J)  On January 7, 2008, Messrs Avila, Barry, Loewy, and Patterson, as pro-se Plaintiffs, apparently filed a lawsuit against G. Flint Taylor, Michael Deutsch, Joey Mogul, Standish Willis, the PLO and Northwestern University Professor Sam Tenenbaum in the Circuit Court of Cook County.  (*Chicago Tribune*, January 8, 2008, attached as Exhibit K)  This patent attempt to avoid the jurisdiction of this Court, which clearly is in the best position to evaluate the respective contributions of past and present counsel, and to intimidate counsel by publicizing false allegations against PLO, apparently includes, among its many outrageous claims, that counsel had "extorted" these lawyers and Mr. Patterson by making an offer to settle the fees claim.[19]  This offer was made through Mr. Tenenbaum, at Avila and Loewy's request, and with the encouragement of mediating Judge Marvin Aspen.[20]

The full City Council approved all four settlements on January 9, 2008.

The PLO lawyers' campaign to enforce the $14.8 million settlement had an obviously beneficial impact on Plaintiff Patterson's settlement. Unable to settle his case individually, the public fight to enforce the $14.8 million settlement not only created a powerful coattail effect for Plaintiff Patterson, but also set the monetary bar at approximately $5 million per torture Plaintiff. While the value of Plaintiff's individual case, standing alone, had substantially decreased due to his federal arrest, conviction, disruptive court behavior, and 30 year sentence, as well as his shift in counsel, the City's desire to resolve all four of the cases at the same time intensified as the campaign to settle gathered momentum, and the City convinced its excess insurance carrier to

---

[19]Mr. Bradley first made the claim that PLO was trying to "extort $1 million" at the December 10 Finance Committee Hearing.

[20]This past fall, Mr. Tenenbaum, at the behest of mediating Judge Marvin Aspen, attempted to mediate a settlement between Avila, the Texas lawyers (Barry and Loewy), and the PLO.  The PLO communicated, through Tenenbaum, a reduced demand of $1,000,000, plus costs, to settle their *quantum meruit* attorneys' fees claim, and proposed that the total fee award to all attorneys be capped at 38%.  In response, Barry and Loewy, in a letter dated November 7, 2007, asserted that Patterson was "**furious**," (sic) with our proposal, that he and the lawyers considered it to be "extortion," that they were contemplating a malpractice suit against PLO, and that they would create a "very embarrassing situation" for PLO in a "very public process" that "will not be an enjoyable experience" for an office that "ostensibly claims to work for the common good."  (Letter attached as Exhibit L)

treat all four cases as one incident for purposes of coverage.[21]  Hence, directly after the City formally agreed to honor the $14.8 million settlement with Hobley, Orange and Howard, it also agreed to settle Plaintiff Patterson's case for $5 million.  While Plaintiff Patterson could have obtained a larger net settlement before he was arrested in 2004, and substantially the same net amount if he had settled in late 2005, he obtained substantially the same highly favorable settlement in November of 2007 as a direct result of the PLO lawyers' pre and post withdrawal litigation and settlement work.

### V.      PLO Lawyers' Itemized Fees and Costs
### A.      Civil Fees and Costs

PLO lawyers expended the following hours on Plaintiff's civil claim prior to their withdrawal in January of 2006.  They have divided in half all consolidated hours, which they expended jointly on both the *Patterson* and *Orange* cases.  The hourly rates sought are based on counsel's extensive experience and expertise in the field, the comparable rates of other similarly situated attorneys, and the complexity, difficulty and highly contingent nature of the case, and the quality of their work, as set forth in the affidavits attached as Exhibits M to T.

| | | |
|---|---|---|
| Taylor | 1799.8 hours x 525/hr | = $944,895 |
| Mogul | 1201.9 hours x 325/hr | = $390,617 |
| Deutsch | 148.4 hours x 525/hr | = $ 77,910 |
| Elson | 95.75 hours x 200/hr | = $ 19,150 |

**Total Civil Fee: $1,432,572.00**
**Civil Costs:      $    23,785.89**

See PLO Attorneys' Time Sheets, attached to Exhibits M to P, and Bill of Costs, Exhibit U.

### B.   Criminal Case Hours

PLO has described the hours spent on Patterson's criminal case so that this Court may know of the substantial, essentially unpaid, work that PLO did on Plaintiff's case prior to there being any prospect of recovery in a civil case.  PLO is not seeking payment for these hours, which total more than 3000 in number, from Patterson's civil settlement, although they directly

---

[21] In her testimony before the City Council Finance Committee on December 10, 2007, Corporation Counsel Mara Georges testified that AIG was the City's excess carrier for $15,000,000 to $20,000,000, so that after AIG agreed to treat all four cases as one incident, and the settlement agreement was finalized in the other three cases, all but $200,000 of Plaintiff Patterson's settlement was covered by AIG, rather than by the City. (PLO has a video of this testimony and has ordered the transcript.)

14

led to Plaintiff's innocence pardon on the basis of his tortured confession, which, in turn, paved the way for his civil lawsuit.[22]

### VI.    PLO and the Successor Attorneys Are Entitled to a Reasonable Fee Based on Quantum Meruit.[23]

Under Illinois law, an attorney who withdraws because the client refuses to accept a settlement agreement or negotiate as the attorney thinks best is entitled to compensation on a *quantum meruit* basis. *McGill v. Garza*, 2007 Ill. App. LEXIS 1284 *6-7 (1st Dist.); *Kannewurf v. Johns*, 260 Ill. App. 3d 66, 72-73 (5th Dist.1994); *see also, Leoris & Cohen, P.C. v. McNiece,* 226 Ill. App. 3d 591 (2nd Dist. 1992); *Wegner v. Arnold*, 305 Ill. App. 3d 689 (2nd Dist. 1999).  A complete breakdown in the attorney-client relationship also is a justifiable basis for allowing an attorney to withdraw and to still receive a *quantum meruit* award of attorney fees. *McGill*, 2007 Ill. App. LEXIS at *6; *Leoris & Cohen*, 226 Ill. App. 3d at 597.

Where *quantum meruit* applies, the contingent fee agreement no longer controls the attorneys' recovery, although it may provide a guideline for what is reasonable.  *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 230 (1979); *Wegner*, 305 Ill. App. 3d at 695.  Under *quantum meruit*:

> [The] trial court is literally to award the attorney "'as much as he deserves.'" *Kannewurf v. Johns, 260 Ill. App. 3d 66, 74, 632 N.E.2d 711 (1994)*, quoting *Lee v. Ingalls Memorial Hospital, 232 Ill. App. 3d 475, 478, 597 N.E.2d 747 (1992)*. The trial judge has broad discretion in matters of attorney fees due to the advantage of close observation of the attorney's work and the trial judge's deeper understanding of the skill and time required in the case. *Kannewurf, 260 Ill. App. 3d at 74*. In making its determination, the trial court should assess all of the relevant factors, including the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the client. *Kannewurf, 260 Ill. App. 3d at 74*.

*Id.* at 693.  Moreover, where an attorney has withdrawn and has been replaced by successor attorneys, both the fees of the withdrawing attorney **and** the successor attorney should be determined by the court pursuant to *quantum meruit*. *Id.* at 697.  In each case, the court should determine what the attorneys deserve.  *Id.*

---

[22]PLO is also not seeking payment for defending Plaintiff on a misdemeanor criminal charge.

[23]  Stan Willis and Demitrus Evans are also entitled to attorneys' fees, although their entitlement is pursuant to their agreement with PLO, who all agreed that Willis should receive 20% and Evans 10% of any attorneys' fees received by these attorneys.  Mr. Wills, who is represented by the PLO, and Ms. Evans, who is represented by Stanley Hill, have indicated that they are not independently petitioning for payment pursuant to *quantum meruit*, since they did not expend a substantial amount of hours on this civil litigation.

Thus, to determine the reasonable fee of PLO, as well as the reasonable fee of successor attorneys, Avila and Tomic and the Texas attorneys they enlisted to help, Barry and Loewy, this Court should look at "the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the client," *Wegner* at 693.

While there is no one way in which to determine *quantum meruit*, there are three reasonable approaches which PLO suggests to the Court. If the Court looks to the PLO/Patterson retainer agreement and the amount offered in settlement while counsel was representing Plaintiff, the award to PLO should be $1,333,333 plus costs. If the Court looks to the PLO/Patterson retainer agreement and the $5,000,000 ultimately obtained, the amount should be $1,655,555 plus costs. If the Court looks instead to the hours spent on the civil case by PLO, the award to their lawyers should be $1,432,572 plus costs. Each of these amounts is amply justified by all of the factors set forth in *Wegner*, since PLO lawyers worked tirelessly for Plaintiff prior to their withdrawal, brought to the case a unique set of skills and knowledge which was the primary reason for the City being pushed to consider settlement, and continued to work to advance the overall settlement of the torture cases after their withdrawal from the case.

Additionally, PLO believes that the total fee to be paid by Mr. Patterson to all attorneys, past and present, should not be excessive, and has previously proposed that total attorneys' fees (excluding costs), should be capped at 38%. If the court adopts this cap, then total attorneys' fees to be paid by Plaintiff would be capped at $1,900,000, with Plaintiff additionally being liable for costs. This would leave a range of approximately $244,445 to $566,667, plus reasonable costs, to Plaintiff's successor attorneys, which appears more than reasonable considering the relative amount of work they appear to have done and the very limited extent to which the settlement finally reached, in real terms to the Plaintiff, was more favorable than the settlement possible during PLO's representation.

Dated: January 14, 2008

Respectfully submitted,
/s/ G. Flint Taylor
Joey L. Mogul, John L. Stainthorp
Michael E. Deutsch, Ben H. Elson
People's Law Office

Standish E. Willis
Attorney-Claimants

16